UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KFC CORPORATION                                    CIVIL ACTION

VERSUS                                                    NO. 16-16791

IRON HORSE OF METAIRIE ROAD,              SECTION "R" (5)
LLC AND IRON ROOSTER, LLC

## ORDER AND REASONS

Before the Court is third-party defendant Professional Service Industries Inc.'s (PSI's) motion to dismiss or transfer for *forum non conveniens* the third-party complaint filed by defendants/third-party plaintiffs Iron Horse of Metairie Road, L.L.C. and Iron Rooster, L.L.C.[1] For the following reasons, PSI's motion is granted because certain contracts between PSI and Iron Horse and Iron Rooster contain a forum selection clause precluding the third-party complaint from being filed in this forum. Plaintiff KFC Corporation's motion to sever and try Iron Rooster's third-party complaint separately,[2] PSI's motion to dismiss for failure to state a claim,[3] and PSI's motion for summary judgment[4] are all denied as moot.

---

[1]     R. Doc. 71.
[2]     R. Doc. 66.
[3]     R. Doc. 97.
[4]     R. Doc. 99.

## I.    BACKGROUND

The present motion concerns a third-party complaint filed by Iron Horse and Iron Rooster against PSI.[5]  The Court first recounts the facts of the underlying dispute.

### A.    Environmental Contamination

The initial complaint in this litigation arose out of a dispute over the remediation of environmental contamination on property in Metairie, Louisiana.[6]  In 1991, Kentucky Fried Chicken (KFC) of California purchased a piece of real property located at 702 Metairie Road in Metairie (the Property).[7]  KFC California later learned that the Property and an adjoining property located at 800 Metairie Road were contaminated with perchloroethylene and its metabolites (the PERC contamination).[8]   All parties agree that this contamination was caused by a dry-cleaning facility that operated on the premises before KFC California purchased the Property.[9]

---

[5]    R. Doc. 58.
[6]    R. Doc. 1.
[7]    R. Doc. 65-3 at 1; R. Doc. 76-1 at 2.
[8]    *Id.*
[9]    R. Doc. 1 at 2 ¶ 8; R. Doc. 58 at 3 ¶ 8; R. Doc. 99-1 at 3.

In 2000, the owner of the adjoining property filed suit against KFC California and other defendants over the environmental contamination.[10] This litigation ended in a settlement and stipulated consent decree.[11] In the consent decree, KFC California agreed to remediate the PERC contamination on its property at 702 Metairie Road and the adjoining property.[12] The agreement provided that remediation would be subject to oversight and approval by the Louisiana Department of Environmental Quality (LDEQ), and would follow timetables and deadlines set by the LDEQ.[13]

In November 2004, PSI prepared for KFC California a Voluntary Remedial Action Plan (VRAP) that set forth procedures for the environmental remediation.[14] PSI is an environmental consultant.[15] This plan was submitted in March 2005 and approved by the LDEQ (the 2005 VRAP).[16] PSI and KFC California then allegedly entered into a contract whereby PSI would perform environmental consulting services for KFC California in connection with the Property (the PSI Contract).[17] In 2005,

---

[10]    R. Doc. 1-2; R. Doc. 65-3 at 2; R. Doc. 76-1 at 2.
[11]    R. Doc. 1-2.
[12]    *Id.* at 2.
[13]    *Id.* at 3.
[14]    R. Doc. 13-13; R. Doc. 13-16.
[15]    R. Doc. 65-3 at 2; R. Doc. 76-1 at 3.
[16]    R. Doc. 13-13; R. Doc. 13-17 at 39.
[17]    R. Doc. 99-2 at 1; R. Doc. 121-1 at 2; R. Doc. 13-18 at 20.

KFC California transferred its interest in the property to KFC U.S. Properties, Inc.[18]

## B.    Sale of the Property and Due Diligence Period

On September 20, 2013, Iron Horse agreed to purchase the Property from KFC U.S. Properties in a written purchase agreement.[19]  The purchase agreement provided for a 30-day inspection and due diligence period, and gave Iron Horse the right to cancel the purchase agreement during this period.[20]  Iron Horse then assigned the purchase agreement to Iron Rooster (hereinafter, Iron Horse and Iron Rooster are collectively referred to as Iron Rooster).[21] After the agreement was signed, KFC U.S. Properties merged into plaintiff KFC Corporation, and title to the Property was thus transferred to KFC Corporation.[22]

Iron Rooster alleges that KFC Corporation instructed PSI to assist Iron Rooster during the due diligence period, and to treat Iron Rooster as if it were a client.[23]  Iron Rooster alleges that one day before the close of sale, PSI provided Iron Rooster with a proposal for a new VRAP (the 2014 VRAP

---

[18]    R. Doc. 65-3 at 3; R. Doc. 76-1 at 3.
[19]    R. Doc. 13-9; R. Doc. 65-3 at 3; R. Doc. 76-1 at 4.
[20]    R. Doc. 13-9 at 2; R. Doc. 65-3 at 3; R. Doc. 76-1 at 4.
[21]    R. Doc. 65-3 at 7; R. Doc. 76-1 at 5.
[22]    R. Doc. 65-3 at 7; R. Doc. 76-1 at 5.
[23]    R. Doc. 58 at 4 ¶ 15.

Proposal).[24]  Iron Rooster states that in the 2014 VRAP Proposal, PSI indicated it would recommend to the LDEQ that the Property receive an "LDEQ VRP Certificate of Completion."[25]  Iron Rooster further alleges that it relied on the 2014 VRAP Proposal when it agreed to proceed with the sale.[26]

On February 14, 2014, after the due diligence period was complete, KFC Corporation sold the Property to Iron Rooster.[27]  On the date of sale, KFC Corporation and Iron Rooster also signed an Assignment, Assumption, and Indemnification Agreement.[28]  The assignment agreement purported to assign to Iron Rooster KFC Corporation's rights under the PSI Contract.[29] The agreement specifically provided that Iron Rooster would assume KFC Corporation's obligations related to the contamination, the remediation, and the settlement agreement, and that Iron Rooster would complete the remediation "in a diligent and expeditious manner."[30]  The preamble to the assignment agreement states that remediation "is in progress pursuant to a

---

[24]   *Id.* at 7 ¶¶ 30, 32.
[25]   *Id.* 7 ¶ 31.
[26]   *Id.* 7 ¶ 34.
[27]   R. Doc. 99-2 at 1; R. Doc. 121-1 at 2.
[28]   R. Doc. 13-11; R. Doc. 65-3 at 7; R. Doc. 76-1 at 5.
[29]   R. Doc. 99-2 at 1; R. Doc. 121-1 at 2.
[30]   R. Doc. 13-11 at 3-4.

voluntary remediation plan" and "was and is being handled by Professional

Services Industries, Inc. (PSI)."[31]

## C. Post-Sale Remediation

After Iron Rooster purchased the Property, PSI continued to perform

remediation services for Iron Rooster.[32]  PSI and Iron Rooster entered into

at least three agreements outlining PSI's post-sale remediation work (the

post-sale agreements).[33]  First, in March 2014, Iron Rooster authorized PSI

to undertake confirmatory soil sampling to verify the required remediation.[34]

Second, in June 2014, Iron Rooster authorized PSI to complete a new VRAP

that would meet the LDEQ's requirements for obtaining a certificate of

---

[31]     *Id.* at 2.

[32]     R. Doc. 99-2 at 2; R. Doc. 121-1 at 3.

[33]     R. Doc. 71-3; R. Doc. 71-4; R. Doc. 71-6.  Iron Rooster appears to argue that the post-sale agreements are not enforceable contracts because Iron Rooster did not sign the authorization pages attached to the agreements.  R. Doc. 81 at 7-8; R. Doc. 71-3; R. Doc. 71-4; R. Doc. 71-6.  But Iron Rooster explicitly states in its third-party complaint that it authorized each of the post-sale agreements, which would render them enforceable contracts.  *See* R. Doc. 58 at 11 ¶¶ 46, 49; 15 ¶ 69.  To the extent that Iron Rooster's opposition brief to PSI's motion for *forum non conveniens* contradicts these explicit allegations in the third-party complaint, the Court construes Iron Rooster's opposition as an untimely motion to amend its pleadings, which the Court denies under Federal Rule of Civil Procedure 16(b).  *See Morin v. Moore*, 309 F.3d 316, 323 (5th Cir. 2002); *Imbornone v. Tchefuncta Urgent Care, Inc.*, No. 11-3195, 2013 WL 3818331, at *4 (E.D. La. July 22, 2013) (applying the Rule 16(b) "good cause" standard to an opposition brief that amended the pleading after the deadline set by the scheduling order).

[34]     R. Doc. 58 at 11 ¶ 46; R. Doc. 71-3.

completion.[35]  Pursuant to the June 2014 agreement, PSI committed to prepare a new VRAP, publicly notice the new VRAP, and submit responses to public and LDEQ comments on the proposed VRAP.[36]  Iron Rooster alleges that PSI represented that the steps in the June 2014 agreement were necessary to obtain final LDEQ approval of the remediation, which would allow Iron Rooster to finally develop the Property.[37]  Third, in June 2015, Iron Rooster authorized PSI to conduct off-site remediation sampling at a site adjacent to the Property.[38]  Iron Rooster and PSI dispute whether these agreements amended the PSI Contract, or whether they were wholly separate from the PSI Contract.[39]

Each of the post-sale agreements contained an identical "Choice of Law and Exclusive Venue" provision.[40]  The provision states:

> The exclusive venue for all actions or proceedings arising in connection with this agreement shall be either the Circuit Court in DuPage County, Illinois, or the Federal Court for the Northern District of Illinois.[41]

---

[35]     R. Doc. 58 at 11 ¶ 49; R. Doc. 71-4 at 2.  Iron Rooster confirms in its response to PSI's motion for summary judgment that the document PSI includes as R. Doc. 71-4 is the June 2014 agreement Iron Rooster references in paragraph 49 of its third-party complaint.  *See* R. Doc. 121 at 3 n.22.

[36]     R. Doc 71-4.

[37]     R. Doc. 58 at 12 ¶ 51.

[38]     *Id.* at 15 ¶¶ 68-69; R. Doc. 71-6.

[39]     R. Doc. 99-2 at 2; R. Doc. 121-1 at 3.

[40]     R. Doc. 71-3 at 10; R. Doc. 71-4 at 8; R. Doc. 71-6 at 12.

[41]     *Id.*

7

In March 2015, pursuant to the 2014 VRAP Proposal and June 2014 agreement, PSI submitted a revised VRAP to the LDEQ on Iron Rooster's behalf (the 2015 VRAP).[42]  According to Joseph Caldarera, Iron Rooster's sole member, the 2015 VRAP was not accepted by the LDEQ because the 2005 VRAP remained in place.[43]

In June 2016, the LDEQ sent letters to both KFC Corporation and Iron Rooster regarding the status of remediation at the Property.[44]  A June 14, 2016 letter to Iron Rooster stated that the extent of the contamination at the Property had not been evaluated and completed, and that it was the LDEQ's understanding that remediation efforts had ceased since the sale of the Property.[45]  A June 6, 2016 letter to KFC Corporation similarly stated that on-site remediation and monitoring of site conditions ceased after Iron Rooster purchased the Property, and that KFC Corporation remained obligated to remediate the contamination.[46]

---

[42]     R. Doc. 76-5; *see also* R. Doc. 23-4 at 13; R. Doc. 65-2 at 2.
[43]     R. Doc. 121-2 at 5.
[44]     R. Doc. 58 at 17 ¶ 78; R. Doc. 76-4.
[45]     R. Doc. 76-4 at 1.
[46]     R. Doc. 1-2 at 41-42.

### D. KFC's Initial Complaint and Iron Rooster's Third-Party Complaint

On December 1, 2016, KFC Corporation filed suit against Iron Rooster, alleging violations of the purchase and assignment agreements.[47] The complaint alleged that Iron Rooster failed to fulfill its obligation to remediate the environmental contamination on the Property.[48]

On February 28, 2018, Iron Rooster filed a third-party complaint against PSI seeking indemnification for any damages Iron Rooster may owe KFC Corporation.[49] The third-party complaint contains claims for breach of contract (Count One), specific performance (Count Two), detrimental reliance (Count Three), negligent and fraudulent misrepresentation (Count Four), negligent and fraudulent suppression (Count Five), and attorney fees (Count Six).[50] Iron Rooster alleges that PSI breached its contractual commitments to complete the remediation process on Iron Rooster's behalf.[51] Iron Rooster further alleges that during and after the due diligence period, PSI misrepresented and failed to disclose relevant facts about the

---

[47] R. Doc. 1.
[48] *Id.* at 10 ¶ 35.
[49] R. Doc. 58 at 2 ¶ 4.
[50] *Id.* at 20-30.
[51] *Id.* at 20-25.

status of the environmental remediation, which prevented Iron Rooster from completing the remediation and developing the property.[52]

### E.  Motion to Dismiss or Transfer

On April 10, 2018, PSI moved to dismiss or transfer the third-party complaint for *forum non conveniens*.[53]  PSI argues dismissal or transfer is required because the March 2014, June 2014, and June 2015 agreements, as well as an agreement from August 2014, contain forum selection clauses requiring litigation arising from the contracts to be brought in state or federal court in Illinois.[54]  Iron Rooster argues in its opposition that the agreements PSI cites do not form the basis of its contract claims in the third-party complaint.[55]  Iron Rooster states that its contract claims instead assert a breach of the PSI Contract, which was assigned to Iron Rooster on the date of sale and which does not contain a forum-selection clause.[56]  Iron Rooster further argues in the alternative that if its contract claims do assert a breach of the three post-sale agreements, the Court should not enforce the forum-selection clauses because (1) the majority of Iron Rooster's claims can be tried in Louisiana, so in the interest of judicial economy the contract claims

---

[52]    *Id.* at 25-29.
[53]    R. Doc. 71.
[54]    R. Doc. 71-1.
[55]    R. Doc. 81 at 1.
[56]    *Id.* at 2.

should be tried here as well;[57] and (2) Iron Rooster would be subject to "grave inconvenience or unfairness" because a transfer would, "as a practical matter," prevent Iron Rooster from seeking indemnity from PSI for any potential damages owed to KFC Corporation.[58] PSI argues in its reply that the PSI Contract cannot form the basis of Iron Rooster's contract claims because the PSI Contract contained a clause prohibiting assignment.[59] PSI further argues that even if the assignment of the PSI Contract was valid, Iron Rooster has conceded that the post-sale agreements amended the PSI Contract, so the agreements' forum-selection clauses would still govern.[60]

## II.  LEGAL STANDARD

The doctrine of *forum non conveniens* allows a court to decline jurisdiction, even when the case is properly before the court, if the case may be tried in another forum more conveniently.  *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 313 (5th Cir. 2008).  The doctrine "rests upon a court's inherent power to control the parties and the cases before it and to prevent its process from becoming an instrument of abuse or injustice."  *In re Air*

---

[57]   *Id.* at 12.
[58]   *Id.* at 13.
[59]   R. Doc. 90 at 2.
[60]   *Id.* at 4.

*Crash Distaster near New Orleans v. Pan Am. World Airways, Inc.*, 812 F.2d 1147, 1153-54 (5th Cir. 1987) (en banc), *vacated on other grounds sub nom. Pan Am. World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989), *opinion reinstated on other grounds*, 883 F.2d 17 (5th Cir. 1989) (en banc).  The doctrine allows dismissal or transfer of a case when "the forum chosen by the plaintiff is so completely inappropriate and inconvenient that it is better to stop the litigation in the place where brought and let it start all over again somewhere else." *In re Volkswagen*, 545 F.3d at 313 n.8 (quoting *Norwood v. Kirkpatrick*, 349 U.S. 29, 31 (1955)).  Because the doctrine "not only denies the plaintiff the generally accorded privilege of bringing an action where he chooses, but [also] makes it possible for him to lose out completely," it is subject to "careful limitation." *Id.*  In deciding a motion to transfer for *forum non conveniens*, a court is not limited to the allegations in the complaint, but may consider all of the evidence before it.  *See Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 158-59 (2d Cir. 1980) (en banc) ("[I]t is the well-established practice . . . to decide [*forum non conveniens*] motions on affidavits.").

The existence of a contractual forum selection clause imposes a heavy burden on the party resisting transfer.[61] *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 586 (1991). Forum selection clauses are prima facie valid and should be enforced unless the non-moving party can show that enforcement would be unreasonable or unjust under the circumstances. *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 16-17 (1972). Unreasonableness may exist when (1) the incorporation of the forum selection clause into the parties' contract was a result of fraud or overreaching; (2) the party seeking to escape enforcement of the forum selection clause "will . . . be deprived of his day in court" because of grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; and/or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state. *Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997) (citing *Carnival Cruise Lines*, 499 U.S. at 595). The non-moving party may also argue that certain public-interest factors weigh in favor of denying the motion to transfer. *Al Copeland Invs., L.L.C. v. First Specialty Ins. Corp.*, 884 F.3d 540, 545 (5th Cir. 2018). These factors include:

---

[61] In the Fifth Circuit, federal law governs the enforceability of forum-selection clauses in diversity cases. *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 301 (5th Cir. 2016).

> (1) administrative difficulties flowing from court congestion; (2) local interest in having localized controversies decided at home; (3) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; (4) the avoidance of unnecessary problems in conflict of laws; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty.

*Id.* The Supreme Court recently explained that "a valid forum-selection clause should be given controlling weight in all but the most exceptional cases." *See Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for W. Dist. Of Tex.*, 571 U.S. 49, 63 (2013) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 587 U.S. 22, 33 (1988)).

## III. DISCUSSION

### A. Transfer, Rather Than Dismissal, Is the Proper Remedy

PSI has fashioned its motion as a "Motion to Dismiss for *Forum Non Conveniens* and Alternative Motion to Transfer."[62] The Court finds that if PSI's motion is granted, transfer rather than dismissal is the appropriate remedy. Under 28 U.S.C. § 1406(a), a district court can dismiss a case if it has been filed in the "wrong" venue. Similarly, under Federal Rule of Civil Procedure 12(b)(3), a party may move to dismiss a case for "improper venue." The question of whether a venue is "wrong" or "improper" is

---

[62]   R. Doc. 71-1.

generally governed by 28 U.S.C. § 1391.  *See Atl. Marine Constr.*, 571 U.S. at 55-56.  Section 1391 allows a civil action to be brought in a district "in which a substantial part of the events . . . giving rise to the claim occurred.  § 1391(a)(1).  PSI does not argue that the Eastern District of Louisiana is the "wrong" or "improper" venue as defined by Section 1391.  Indeed, because nearly all of the relevant events took place in Louisiana, this district would indisputably be the correct venue for the litigation absent the forum selection clause in the post-sale agreements.  PSI instead argues that the forum selection clauses are valid, enforceable, and clearly delineate the courts in which Iron Rooster's claims can be brought.  The Supreme Court has instructed that transfer under 28 U.S.C. § 1404(a) is the appropriate remedy in this situation.  *Atl. Marine Constr.*, 571 U.S. at 59-60.

## B.   Iron Rooster Alleges PSI Breached the Post-Sale Agreements

The parties first dispute whether Iron Rooster's third-party complaint contains allegations that PSI breached the post-sale agreements.[63]   Iron Rooster argues in its opposition that its contract claims are based solely on an alleged breach of the PSI Contract, and that it does not seek to enforce the post-sale agreements.[64]  But the June 2014 agreement—which Iron Rooster

---

[63]   R. Doc. 81 at 2; R. Doc. 90 at 2.
[64]   R. Doc. 81 at 2.

refs to as an "extension, modification, and/or amendment to the PSI Contract"[65]—figures prominently in Iron Rooster's breach of contract allegations.[66] Iron Rooster states that pursuant to the June 14 agreement, PSI committed to "prepare and obtain a new VRAP and application as contemplated by the 2014 VRAP Proposal" that would garner final approval from the LDEQ.[67] Iron Rooster explicitly alleges that PSI breached the commitments PSI made in the June 14 agreement,[68] and that Iron Rooster was injured as a result of that breach.[69]

Iron Rooster also refers to the March 2014 and June 2015 agreements as extensions, modifications, and/or amendments to the PSI Contract.[70] Iron Rooster alleges throughout the third-party complaint that PSI breached its contractual commitments set forth "(a) in the PSI Contract, (b) *in amendments, supplements and/or extensions of the PSI Contract*; and (c) in express written and oral agreements and commitments entered after the

---

[65]  R. Doc. 58 at 11 ¶ 49.
[66]  *See, e.g., id.* at 11-12 ¶¶ 49-55.
[67]  *Id.* at 11-12 ¶¶ 49, 50.
[68]  *Id.* at 12 ¶ 52.
[69]  *See id.* at 10 ¶ 42. To the extent Iron Rooster's opposition brief to PSI's motion for *forum non conveniens* contradicts these explicit allegations in the third-party complaint, the Court again construes Iron Rooster's opposition as an untimely motion to amend its pleadings, which the Court denies under Federal Rule of Civil Procedure 16(b). *See Morin*, 309 F.3d at 323; *Imbornone*, 2013 WL 3818331, at *4.
[70]  R. Doc. 58 at 11 ¶ 46; 15 ¶¶ 67-68.

February 14, 2014 sale."[71] Iron Rooster therefore also alleges in the third-party complaint that PSI has breached the March 2014 and June 2015 agreements.

Because Iron Rooster has alleged breaches of the post-sale agreements, the Court must next determine whether the scope of the forum-selection clause in those agreements extends to Iron Rooster's other claims in the third-party complaint.

### C.    Scope of Forum-Selection Clauses

Before a court will enforce a forum selection clause, it must first determine "whether the clause applies to the type of claims asserted in the lawsuit." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x 612, 616 (5th Cir. 2007) (quoting *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 692 (8th Cir. 1997)). The court "must look to the language of the parties' contracts to determine which causes of action are governed by the forum selection clause." *Id.* (quoting *Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 222 (5th Cir. 1998)). "[I]f the substance of the[] claims, stripped of their labels, does not fall within the scope of the [forum selection] clauses, the clauses cannot apply." *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993). Contractual forum selection clauses may apply to tort

---

[71]    *Id.* at 21 ¶ 97 (emphasis added).

causes of action depending on the language of the forum selection clause. *See Marinechance Shipping*, 143 F.3d at 222-23 (forum selection clause covering "any and all disputes or controversies arising out of or by virtue of" an employment contract applied to tort claim arising during the course of plaintiff's employment).

To determine whether a forum selection clause applies to tort claims, the Eighth Circuit has enunciated three general tests: (1) whether the tort claims "ultimately depend on the existence of a contractual relationship between the parties"; (2) whether resolution of the tort claims "relates to the interpretation of the contract"; and (3) whether the tort claims "involve the same operative facts as a parallel claim for breach of contract." *Terra Int'l*, 119 F.3d at 694; *see also Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988) (applying the "relates to interpretation of the contract" test). Courts in this district regularly apply the tests articulated in *Terra International* when interpreting forum selection clauses. *See, e.g.*, *Claimserviceprovider, Inc. v. St. Paul Travelers Cos., Inc.*, No. 06-2475, 2006 WL 2989240, at *4 (E.D. La. Oct. 18, 2006); *Chalos & Co., P.C. v.*

*Marine Managers, Ltd.*, No. 14-2441, 2015 WL 5093469, at *5 (E.D. La. Aug. 28, 2015).

Here, the forum selection clauses state that "[t]he exclusive venue for all actions or proceedings arising in connection with this agreement shall be either the Circuit Court in DuPage County, Illinois, or the Federal Court for the Northern District of Illinois."[72]  The operative language is "all actions or proceedings arising in connection with this agreement."[73]

As a general rule, courts read forum selection clauses broadly, "in keeping with the public policy favoring their use." *Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 432 (E.D.N.Y. 2014) (collecting cases). "The term 'arising' is generally interpreted as indicating a causal connection." *Braspetro Oil Servs.*, 240 F. App'x at 616; *see also Phillips v. Audio Active Ltd.*, 494 F.3d 378, at 389 (2d Cir. 2002) (noting that to "arise out of" means "to originate from a specified source, and generally indicates a causal connection").  Courts in numerous circuits have held that the phrase "arising out of," and similar language, "is broad in scope and reaches all disputes that have their origin in the . . . contract, regardless of whether the dispute involves interpretation or performance of the contract per se."

---

[72]     R. Doc. 71-3 at 10; R. Doc. 71-4 at 8; R. Doc. 71-6 at 12.
[73]     *Id.*

*Marzano v. Proficio Mortg. Ventures, LLC*, 942 F.Supp.2d 781, 789 (N.D. Ill. 2013) (collecting cases); *see also Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1515 (10th Cir. 1995) (holding that "arising in connection with the implementation, interpretation or enforcement" was broad language); *TradeComet.com LLC v. Google, Inc.*, 435 F. App'x 31, 35 (2d Cir. 2011) (interpreting a forum selection clause that reads, "arising out of or relating to this agreement or the Google Program(s)," broadly to encompass plaintiff's claim). Similarly, courts hold that the use of phrases like "arising out of" or arising "in connection with" should be read broadly to encompass both contractual and tort claims. *See, e.g.*, *Roby*, 996 F.2d at 1361 (holding that there is "no substantive difference . . . between the phrases 'relating to,' 'in connection with' or 'arising from,'" and that such language should be broadly read to include tort actions); *Paduano*, 55 F. Supp. 3d at 432 ("[W]hen 'arising out of,' 'relating to,' or similar language appears in a forum selection clause, such language is regularly construed to encompass securities, antitrust, and tort claims associated with the underlying contract.") (internal quotation marks omitted).

Courts also find phrases like "any dispute" or all "litigation of any dispute" in a forum selection clause, or in a similar contractual provision, to be indicative of a clause's broad scope. *See Claimserviceprovider, Inc.*, 2006

WL 2989240, at *1, *5-6 (finding that a forum selection clause covering "litigation of any dispute arising under" the contract broadly applied to plaintiff's claims for fraud, negligence, and conversion); *Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*, 850 F.2d 756, 760 (D.C. Cir. 1988) (explaining that the phrase "[a]ny claim or controversy" is broad in scope); *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir. 2001) (interpreting broadly a clause that stated, "any dispute arising from the making, performance or termination of this Charter Party").

The Court now turns to whether the forum selection clause in the post-sale agreements encompasses Iron Rooster's contract, tort, detrimental reliance, or attorney fees claims.

### 1.   *Contract claims*

As the Court has already noted, Iron Rooster alleges that PSI breached its contractual commitments set forth "(a) in the PSI Contract, (b) in amendments, supplements and/or extensions of the PSI Contract; and (c) in express written and oral agreements and commitments entered after the February 14, 2014 sale."[74]  Iron Rooster principally argues that its contract claims are based solely on a breach of the PSI Contract, which does not

---

[74]    *Id.* at 21 ¶ 97 (emphasis added).

contain a forum selection clause.[75]  The Court has already determined that Iron Rooster in fact alleges that PSI breached each of the post-sale agreements.  However, it could still be true that Iron Rooster's separate allegation that PSI breached the PSI Contract is not subject to the forum selection clause in the post-sale agreements.  But Iron Rooster's third-party complaint explicitly states that each of the post-sale agreements was an extension, modification, and/or amendment to the PSI Contract.[76]  Iron Rooster therefore concedes that the post-sale agreements amended the PSI Contract to include the forum selection clause, rendering any allegation that PSI violated the terms of the PSI Contract subject to the forum selection clause.

But even if the post-sale agreements are better classified as separate contracts from the PSI Contract, rather than amendments to it, the post-sale agreements are so similar to the PSI Contract that adjudicating all of Iron Rooster's breach of contract claims would involve the same operative facts.  The PSI Contract laid out the scope of services PSI would provide KFC

---

[75]     The parties dispute whether Iron Rooster can assert that PSI breached the PSI Contract, because the PSI Contract contained a provision prohibiting assignment.  R. Doc. 81 at 6 n.14; R. Doc. 90 at 2.  The Court need not, and will not, address this question in the context of PSI's present motion.

[76]     R. Doc. 58 at 11 ¶¶ 46, 49; 15 ¶¶ 67-68.

Corporation in order to remediate the contamination at the Property.[77] Iron Rooster alleges that PSI breached the PSI Contract because "it failed and refused to complete the remediation services as described in that contract."[78] Each of the post-sale agreements similarly authorizes PSI to take certain steps to complete the remediation.[79] In particular, the June 2014 agreement authorized PSI to complete an updated VRAP that would meet the LDEQ's requirements for obtaining a certificate of completion.[80] In the PSI Contract and post-sale agreements PSI thus committed to achieve the same broad goal—to complete the remediation so that Iron Rooster can develop the property. Iron Rooster in fact conflates the PSI Contract and the post-sale agreements in its third-party complaint, alleging that "[p]ursuant to the PSI Contract[] and pursuant to written and oral agreements to extend modify and/or amend the PSI Contract . . . , PSI committed to conduct ongoing investigation and remediation services to implement the new 2014 Proposed VRAP."[81] Iron Rooster also concedes in its opposition to PSI's *forum non conveniens* motion that the post-sale agreements can best be viewed as

---

[77] R. Doc. 13-18 at 23-26; R. Doc. 81 at 3.
[78] R. Doc. 58 at 21 ¶ 98.
[79] R. Doc. 71-3; R. Doc. 71-4; R. Doc. 71-6.
[80] R. Doc. 71-4 at 2.
[81] R. Doc. 58 at 9 ¶ 40.

23

authorizations for PSI to perform specific tasks "in furtherance" of the goals set by the PSI Contract.[82]

The Court therefore finds that determining whether PSI breached its commitments in the PSI Contract would "involve the same operative facts" as Iron Rooster's parallel claim for breach of the post-sale agreements. *See Terra Int'l*, 119 F.3d at 694; *Claimserviceprovider, Inc.*, 2006 WL 2989240, at *5 (ruling that a forum selection clause covering disputes "arising under" the contract applied to an alleged breach of a separate contract, because both claims would "involve the same operative facts"). Iron Rooster's allegation that PSI breached the PSI Contract therefore "aris[es] in connection" with the post-sale agreements, and the forum selection clause applies to this allegation regardless of whether the post-sale agreements did in fact formally amend the PSI Contract.

### 2. *Tort claims*

Iron Rooster alleges that PSI made material false representations to Iron Rooster during and after the due diligence period regarding the status of the environmental remediation.[83] Iron Rooster also alleges that PSI

---

[82]    R. Doc. 81 at 8 (Iron Rooster argues that "[t]he limited tasks described in the [post-sale agreements] thus were in furtherance of PSI's obligations undertaken in the assigned PSI Contract").

[83]    R. Doc. 58 at 27 ¶ 119 (Count Four).

concealed material information regarding the status of the remediation.[84] Iron Rooster states that it has been damaged by PSI's failure to disclose ongoing delays with the remediation because Iron Rooster has been prevented from "implementing the . . . 2014 VRAP Proposal and developing the property."[85] The June 2014 agreement is the mechanism by which Iron Rooster and PSI agreed to implement the 2014 VRAP Proposal.[86] Iron Rooster's theory of tort damages, then, is that PSI's alleged torts prevented Iron Rooster from realizing its rights under the June 2014 agreement.[87]

Because Iron Rooster's alleged tort injury is inextricably linked with its claim that PSI breached the June 2014 agreement, these tort allegations "aris[e] in connection" with that agreement and are subject to the agreement's forum selection clause. *See Zichichi v. Jefferson Ambulatory Surgery Ctr., LLC*, No. 07-2774, 2007 WL 3353304, at *5-6 (E.D. La. Nov. 7, 2007) (forum selection clause covering "any dispute or matter arising under" an operating agreement encompassed fraud and tort claims because the plaintiff could not "prove resulting injury without showing th[e] rights he

---

[84]     *Id.* at 28 ¶ 126 (Count Five).
[85]     *Id.* at 10 ¶ 42.
[86]     *Id.* at 11 ¶ 49 (alleging that in the June 2014 agreement, "PSI committed to prepare and obtain a new VRAP and application as contemplated by the 2014 VRAP Proposal).
[87]     *Id.* at 10 ¶ 42, 11 ¶ 49.

had pursuant to [the] contract"). In *Zichichi*, the plaintiff alleged that the defendants conspired to terminate his ownership interest in a surgery center. *Id.* at \*1. The plaintiff's ownership interest in the surgery center was established in an operating agreement that contained a forum selection clause. *Id.* at \*1-2. Because the plaintiff's theory of injury was based on a deprivation of his rights under the operating agreement, the court held that the "plaintiff's fraud and conspiracy claims . . . necessarily arise out of the operating agreement." *Id.* at \*6. Here, Iron Rooster's alleged injury similarly depends upon a showing that PSI's misrepresentations and concealments prevented Iron Rooster from realizing its rights under the June 2014 agreement, under which PSI allegedly promised to implement a new VRAP that would ultimately allow Iron Rooster to develop the Property.[88]

The Court also finds that adjudicating Iron Rooster's tort claims would "involve the same operative facts" as adjudicating its contract claims. *See Terra Int'l*, 119 F.3d at 694; *Claimserviceprovider, Inc.*, 2006 WL 2989240, at \*5; *Chalos & Co.*, 2015 WL 5093469, at \*6 (tort claim involved the same operative facts as a parallel contract claim because to prevail on the contract claim, party needed to first prove the conduct underlying its tort claim). Iron Rooster alleges that PSI breached its various contractual commitments by (1)

---

[88]      *Id.* at 10 ¶ 42, 11 ¶ 49, 12 ¶ 51.

failing to disclose that the new VRAP could not be implemented without KFC Corporation's consent; (2) failing to disclose that the 2005 VRAP had been abandoned; (3) failing to disclose that the multi-phase extraction (MPE) system—which was a key component of the remediation effort—had been inoperable since 2012; (4) failing to fully delineate the extent of the contamination; (5) failing to disclose meetings between PSI and the LDEQ during the due diligence period; and (6) falsely representing that all necessary offsite remediation had been completed.[89]  These very same allegations are included in Iron Rooster's tort claims.[90]  Iron Rooster alleges that PSI misrepresented the extent of the contamination at the Property and that the remediation was in progress via the MPE method.[91]  Iron Rooster further alleges that PSI failed to disclose the extent of the contamination, that the MPE system had been abandoned, and that PSI and the LDEQ had met during the due diligence period to discuss a "path forward."[92]  Because Iron Rooster's tort and contract allegations are essentially derivative of one another, the claims revolve around the same operative facts.  *See Chalos & Co.*, 2015 WL 5093469, at *6.  The tort claims therefore "aris[e] in

---

[89]     *Id.* at 21-23 ¶ 99.
[90]     *Id.* at 27 ¶ 119.
[91]     *Id.*
[92]     *Id.*

connection" with the post-sale agreements, which underpin Iron Rooster's breach of contract claims.

Finally, it is of no import that some of the facts underlying Iron Rooster's tort allegations took place before the post-sale agreements were executed. *See Braspetro Oil Servs. Co.*, 240 F. App'x at 616-17. In *Braspetro*, the defendants won a bid to construct a large offshore oil platform. The contract between the parties contained a forum selection clause requiring "any dispute or controversy arising from" the contract to be litigated in Brazil. *Id.* at 616. When the defendants failed to complete the project, the plaintiff filed suit, alleging the defendants breached the parties' agreement and also fraudulently induced the plaintiffs to initially award the project to the defendants. *Id.* at 614. The Fifth Circuit acknowledged that many of the actions underlying the plaintiff's tort claims occurred before the operative contract was executed, but nevertheless enforced the forum selection clause on the plaintiff's tort claims. *Id.* at 616-17.

### 3. *Detrimental reliance claim*

Iron Rooster alleges it detrimentally relied upon eight representations made by PSI during and after the due diligence period: (1) that remediation of the Property was "virtually complete"; (2) that PSI had disclosed accurate information regarding the status of the contamination; (3) that Iron Rooster

could rely upon PSI for accurate information; (4) that KFC Corporation was in compliance with the 2005 VRAP; (5) that the 2015 VRAP would complete the remediation process; (6) that KFC Corporation would accept the 2015 VRAP; (7) that Iron Rooster would soon obtain a Certificate of Completion from the LDEQ; and (8) that after the Property was sold, PSI would continue to provide services to Iron Rooster as necessary until the remediation was complete.[93]

The Court finds that as with Iron Rooster's misrepresentation and suppression claims, the allegations in the claim for detrimental reliance are essentially derivative of the allegations in Iron Rooster's contract claims,[94] and therefore "involve the same operative facts" as the contract claims. *See Terra Int'l*, 119 F.3d at 694; *Claimserviceprovider, Inc.*, 2006 WL 2989240, at *5. Iron Rooster's claim for detrimental reliance is thus also subject to the forum selection clause in the post-sale agreements.

### 4. *Attorney fees claim*

Iron Rooster's third-party complaint includes a cause of action for attorney fees under Louisiana Civil Code article 1958.[95] This provision provides that "[t]he party against whom rescission is granted because of

---

[93] R. Doc. 58 at 26 ¶ 112.
[94] *Id.* at 21-23 ¶ 99.
[95] *Id.* at 30 ¶ 135.

fraud is liable for damages and attorney fees." La. Civ. Code art. 1958. Under Louisiana law, damages for "attorney's fees are not allowed except where authorized by statute or contract." *Maloney v. Oak Builders, Inc.*, 235 So. 2d 386, 390 (La. 1970). Iron Rooster's fraudulent misrepresentation and suppression causes of action are the only claims to which article 1958 could conceivably apply. As addressed earlier, the Court has already determined that Iron Rooster's tort claims "aris[e] in connection" with its claim that PSI breached the post-sale agreements. Because Iron Rooster's claim for attorney fees is inextricably linked with its tort claims, the claim for attorney fees also "aris[es] in connection" with Iron Rooster's contract claims and is subject to the forum selection clause in the post-sale agreements.

### D. Enforceability of the Forum Selection Clause

Because the Court finds that the forum selection clause applies to each of Iron Rooster's claims, Iron Rooster, as the party resisting enforcement, bears the burden to show that enforcement would be unreasonable or unjust under the circumstances. *See Atl. Marine Constr.*, 571 U.S. at 67; *Haynsworth*, 121 F.3d at 963. To determine whether transfer is unwarranted despite the existence of a valid forum selection clause, the Court looks to (1) the four factors that may indicate enforcement of the clause is unreasonable, *see Haynsworth*, 121 F.3d at 963; and (2) the five public-

interest factors that may weigh in favor of denying transfer despite the enforceability of the clause, *see Al Copeland Invs.*, 884 F.3d at 545.

Iron Rooster cites one of the factors identified in *Haynsworth* to argue that enforcing the forum-selection clause would be unreasonable under the circumstances—that Iron Rooster would suffer "grave inconvenience or unfairness" because enforcement would, "as a practical matter," prevent Iron Rooster from seeking indemnity from PSI for any potential damages owed to KFC Corporation.[96] Iron Rooster argues that a separate indemnification trial in Illinois "is not really an option" because the key witnesses and the Property all reside in Louisiana.[97] But an assertion that the chosen forum is merely inconvenient for the parties or their witnesses is not a sufficient reason for the Court to ignore a forum-selection clause, which is "given controlling weight in all but the most exceptional cases." *Atl. Marine Constr.*, 571 U.S. at 63; *see id.* at 64 ("When parties agree to a forum selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation."). Iron Rooster has not identified any grave unfairness or practical impediment that would essentially deprive it of its day in court in the Illinois

---

[96]     R. Doc. 81 at 12-13.
[97]     *Id.* at 13.

state court or federal court the parties chose as the forum for this controversy.

Moreover, this Court has previously enforced a forum selection clause in the context of a third-party complaint seeking indemnification when enforcement would force the third-party defendant to bring its claim in a foreign country. *See Chalos*, 2015 WL 5093469, at \*2, \*7. In *Chalos*, the defendant argued that the third-party defendant employee's fraudulent misrepresentations induced it to enter into a retainer agreement with the plaintiff, which the plaintiff alleged the defendant breached. *Id.* at \*2. The employee's employment contract with the defendant contained a forum-selection clause granting Greece exclusive jurisdiction over any employment dispute. *Id.* at \*7. This Court reasoned that any litigation connected to the employment contract and third-party complaint was the province of the Greek courts, and granted the employee's *forum non conveniens* motion. *Id.*

Iron Rooster does not specifically argue that transfer is improper pursuant to any of the five public-interest factors the Fifth Circuit commonly applies in an analysis under 28 U.S.C. § 1404(a).[98] *See Al Copeland Invs.*, 884 F.3d at 545. Iron Rooster instead argues that venue in this Court is proper for its non-contract claims, so in the interest of judicial economy the

---

[98] *See id.* at 12.

contract claims should be tried here as well.[99]  This argument is mooted by the Court's finding that all of the claims in Iron Rooster's third-party complaint apply to the forum selection clause in the post-sale agreements. The Court also finds that none of the public-interest factors that courts normally apply in a § 1404(a) analysis is relevant to this case.  The Supreme Court instructs that an otherwise enforceable forum selection clause should only be ignored "under extraordinary circumstances."  *Atl. Marine Constr.*, 571 U.S. at 62.   No such exceptional circumstances are present here.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS PSI's motion to transfer for *forum non conveniens*.    Iron Rooster's third-party complaint is transferred to the Northern District of Illinois.  KFC Corporation's motion to sever and try Iron Rooster's third-party complaint separately, PSI's motion to dismiss for failure to state a claim, and PSI's motion for summary judgment are all DENIED as moot.

---

[99]     *Id.* (citing *Axis Oilfield Rentals, LLC v. Mining, Rock, Excavation & Constr., LLC*, No. 15-1627, 2015 WL 5774801 (E.D. La. Sept. 30, 2015) (noting that courts often consider "judicial economy as an additional public-interest factor")).

New Orleans, Louisiana, this ___31st___ day of July, 2018.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE